Donald F. HARRIS, Plaintiff,

v.

DELCHAMPS, INC., Defendant.

No. Civ.A. 97-D-981-N.

United States District Court,
M.D. Alabama,
Northern Division.

May 26, 1998.

Delores R. Boyd, Montgomery, AL, for Plaintiff.

Jonathan S. Harbuck, Birmingham, AL, Walter W. Christy, Leslie W. Ehret, Ellen S.

Kovach, New Orleans, LA, H. William Wasden, Mobile, AL, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is Defendant Delchamps, Inc.'s ("Delchamps") Motion For Summary Judgment filed January 14, 1998. Delchamps filed its Memorandum In Support ("Def.'s Mem.") on the same date. Plaintiff Donald F. Harris filed his Evidentiary Submission And Memorandum In Opposition ("Pl.'s Mem.") on January 27, 1998. Delchamps filed its Reply Memorandum ("Def.'s Reply") on February 10, 1998. After a careful and thorough review of the arguments of counsel, relevant law, and the record as a whole, the court finds that Delchamps' Motion For Summary Judgment is due to be granted.

## JURISDICTION

The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights) and 42 U.S.C. § 2000e–5 (Title VII). The Parties do not contest personal jurisdiction or venue.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is ne genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a

situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

### I. FACTUAL SUMMARY

On November 19, 1990, Plaintiff Donald F. Harris, a black male, began his employment with Delchamps as a "Journeyman Meatcutter" at Delchamps' Perry Hill Road supermarket in Montgomery, Alabama. In October of 1994, he was transferred to Delchamps' Atlanta Highway supermarket, also in Montgomery. The position of Journeyman Meatcutter is an hourly-wage, non-management position. The position of "Market Manager" is a salaried, management-level position. The Market Manager is the head or supervisor of the Meat Department, and is the next promotional level for a Journeyman Meatcutter.

Between March 2, 1996 and December 15, 1996, the Market Manager position at Delchamps' Atlanta Highway store was vacant on five separate occasions. Delchamps filled each of these five vacancies with white males as follows:

(1) *March 25, 1996* —Vacancy created by March 2, 1996 resignation of Greg Gates filled by Ronald Paige

(2) *May 6, 1996* —Vacancy created by April 3, 1996 resignation of Ronald Paige filled by Alton Bozeman

(3) *July 8, 1996* —Vacancy created by May 30, 1996 resignation of Alton Bozeman filled by Kelly Siler

(4) *September 23, 1996* —Vacancy created by September 20, 1996 resignation of Kelly Siler filled by Wayne Spivey

(5) *December 22, 1996* —Vacancy created by December 5, 1996 resignation of Wayne Spivey filled by Scott Schmacker

(*See* Pl.'s Mem. at 5–6.) Harris alleges that on each occasion, he was fully qualified for promotion, but that Delchamps refused to promote him because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. Harris contends that these selections were made without the hiring or promotional opportunities being advertised, without the benefit of communicated, objective hiring criteria, and that Delchamps' refusal to promote him "reflected its pattern and practice of denying African–Americans, as a class, management positions and promotions and further treating them differently, and more adversely, solely on account of their race, with respect to employment benefits, privileges, terms and conditions."[1] (Pl.'s Mem. at 4; Pl.'s Am.Compl. ¶¶ 9–19.) Predictably, Delchamps contends that all of their employment decisions regarding Harris were based on legitimate, non-discriminatory reasons, not on the basis of his race.

Because many, if not most of the court's findings of fact are inextricably intertwined with its analysis of whether the Parties have met their respective evidentiary burdens, the majority of the court's findings are set forth in the court's Analysis below.

### II. ANALYSIS

In this action, Plaintiff seeks redress via 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.

Section 1981 prohibits race discrimination in the making and enforcing of contracts and is a statutory remedy available in both the public and private sectors.[2] *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e–2(a). The allocation of burdens and elements of a

---

1. At the March 19, 1998 pretrial hearing of this matter, counsel for Plaintiff stated that to the extent Harris' initial pleadings could be construed as asserting systemic disparate treatment or disparate impact claims, such class claims were no longer viable. Consequently, the court views Harris' pleadings as alleging an individual disparate treatment claim against Delchamps, with evidence of systemic disparate treatment proffered in an effort to rebut Delchamps' legiti-

mate, nondiscriminatory reasons for its employment decisions.

2. 42 U.S.C. § 1981 provides in relevant part: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."

prima facie case are the same for employment claims stemming from Title VII and § 1981. *See Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir.1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520 (11th Cir.1994). Accordingly, the court will utilize the familiar *McDonnell Douglas / Burdine* paradigm in analyzing Plaintiff's Title VII and § 1981 claims. *See Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The critical element in establishing wrongful discrimination in violation of Title VII or § 1981 is discriminatory intent. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (Title VII); *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (§ 1981); *Washington v. Davis*, 426 U.S. 229, 246–48, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (§ 1981); *Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 954 (5th Cir.1981) (§ 1981).[3] Discriminatory intent can be established through either direct or circumstantial evidence. *United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

Evidence is "direct" where, if believed, it proves the existence of a fact in issue without inference or presumption. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987) (citation omitted). Direct evidence of discriminatory intent may be evidenced, for example, by "statements indicating racial bias on the part of a decision maker in an employment setting," *Trotter v. Board of Trustees of Univ. of Alabama*, 91 F.3d 1449 (11th Cir.1996) (citing *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 (11th Cir.1995)), " 'statement[s] that members of a [protected class] in gener-

al ... are simply not competent enough to do a particular job,' " *Trotter*, 91 F.3d at 1453 (quoting *Haynes*, 52 F.3d at 931; *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984)), or other "actions or remarks of the employer reflecting a discriminatory attitude." *Williams v. Mead Coated Bd., Inc.*, 836 F.Supp. 1552, 1569–70 (M.D.Ala.1993), *aff'd* 41 F.3d 668 (11th Cir.1994). For statements of discriminatory intent to constitute direct evidence of discrimination, "they must be made by a person involved in the challenged decision," *Trotter*, 91 F.3d at 1454–54, and there must be a correlation between the direct evidence and the discrimination complained of by the employee. *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir.), *opinion amended on other grounds*, 848 F.2d 1522 (11th Cir.1988). When the plaintiff presents direct evidence that discrimination was a motivating factor, "the ultimate issue of discrimination is proved," *Haynes*, 52 F.3d at 931 (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)); *see also Trotter*, 91 F.3d at 1453, and the analysis employed thus differs from cases where only circumstantial evidence is available. *Trotter*, 91 F.3d at 1453 (*citing Bell*, 715 F.2d at 1556.) If and when a plaintiff presents direct evidence of discriminatory intent, " 'it is then left to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached even absent discriminatory intent.' " *Id.* (quoting *Price Waterhouse*, 490 U.S. at 244–45, 109 S.Ct. 1775); *see also Hill*, 841 F.2d at 1539.

In contrast, when the trier of fact must *infer* discrimination based on the evidence, such evidence is circumstantial, rather than direct. *Hill*, 841 F.2d at 1539. A plaintiff can establish a circumstantial case of intentional discrimination under the three-part burden-shifting analysis set forth in *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. 1817, and *Burdine*, 450 U.S. at 248, 101 S.Ct. 1089.

---

3. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

See also St. Mary's, 509 U.S. at 518, 113 S.Ct. 2742.

Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir.1997) (citations omitted). The purpose of the prima facie case is to show an adverse employment decision that resulted from a discriminatory motive. *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983). If the plaintiff meets this burden, he or she is entitled to a legal presumption that the defendant acted with discriminatory intent. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. 1817. The effect of this presumption is to shift to the employer the burden of producing a legitimate, nondiscriminatory reason for the challenged employment action. Combs, 106 F.3d at 1528 (citations omitted). This intermediate burden is "exceedingly light." *Meeks v. Computer Assocs., Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994); *Perryman,* 698 F.2d at 1142; *see also Turnes,* 36 F.3d at 1061. The defendant "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089); *see also Turnes,* 36 F.3d at 1061. Should the defendant fail to meet its burden of production once the plaintiff establishes his or her prima facie case, "the unrebutted presumption of discrimination stands." *Turnes,* 36 F.3d at 1061 (*citing Joshi v. Florida State Univ. Health Ctr.,* 763 F.2d 1227, 1236 (11th Cir.1985)).

If the employer satisfies this burden, however, the presumption of discrimination disappears from the case and the plaintiff must persuade the trier of fact that the employer's proffered reasons were pretextual and that the real reason for the adverse employment decision was, in fact, discriminatory. *Burdine,* 450 U.S. at 253, 256, 101 S.Ct. 1089. "[T]he plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reason-able fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs,* 106 F.3d at 1528 (citations omitted). This may be accomplished by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1528. To survive summary judgment at this point, the plaintiff must come forward with evidence sufficient "to permit a reasonable fact finder to conclude that the employer's proffered non-discriminatory reasons were not what actually motivated its conduct." *Id.* at 1528.

**A. Harris' Prima Facie Case**

After a thorough review of the pleadings and of the record, it appears to the court that Harris is not arguing that there is direct evidence of discrimination, and seems to admit as much: "Plaintiff grounds his legal contentions primarily on circumstantial, rather than direct evidence." (Pl.'s Mem. at 4.) Although Harris has not expounded on his use of "primarily," all of his arguments are couched in terms of a circumstantial case. Consequently, the court will utilize the tripartite burden-shifting analysis outlined above.

To establish a prima facie case under this framework, Harris must present circumstantial evidence sufficient to create an inference that an employment-related decision was racially motivated. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Here, Harris alleges that Delchamps discriminated against him by failing to promote him. To establish a prima facie case of discriminatory failure to promote, Harris must show: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who are not members of the protected class were promoted. *Combs,* 106 F.3d at 1539 n. 11 (citing *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989)).

1. *Harris has established membership in a protected class (first prong), that he applied for the Market Manager position (part of the second prong) and that he was rejected (third prong)*

■ Harris, a black male, alleges discrimination on the basis of his race in violation of Title VII and § 1981. Accordingly, the court finds that Harris has established membership in a protected class, and, consequently, that he has satisfied the first prong of his prima facie case.

■ The evidence in the record, when read in a light most favorable to Harris, also establishes that Harris "applied" for the position of Market Manager on the five occasions at issue. Either through his deposition, or the depositions and affidavits of others, it is clear that someone in Delchamps' management knew of Harris' desire to be promoted to the Market Manager position. Further, Delchamps does not seriously contend that Harris never "applied" for any of the openings. Consequently, the court finds that Harris has satisfied this element of the second prong of his prima facie case.

■ Finally, it is clear from the record, and, indeed, because Harris filed this suit, that he was "rejected" from the position of Market Manager. Delchamps does not seriously dispute this prong of Harris' prima facie case either. Consequently, the court finds that Harris has satisfied the third prong of his prima facie case.

2. *Whether Harris was qualified (part of the second prong) for the Market Manager position and whether an individual outside the protected class who was equally or less qualified (fourth prong) was given the position*

■ Harris contends that he was passed over for the Market Manager position on five separate occasions on the basis of his race. On each of these occasions, a white male was either hired or promoted into the position. The court finds that Harris has failed to establish that he was either qualified for the position himself, or that the individual hired was as qualified or less qualified than Harris for the position. Because such findings are fact specific, the court will address each of the vacancies in turn.

In November of 1994, approximately one month after being transferred to Delchamps' Atlanta Highway store, Store Manager Donald Ewing placed Harris in charge of its Seafood Department. Ewing chose Harris over two white males that were also Journeymen Meatcutters who had expressed interest in the position—Wade Stephenson and Randy Clark. Plaintiff was never given the formal title of Seafood Manager because that position only paid a starting rate of $8.50 per hour. Instead, Harris remained classified as a Journeyman Meatcutter and was paid $14.05 per hour. He served in that position for ten months—until approximately August 1995. During this time period, he only spent about two hours per day fulfilling meatcutting duties. During his tenure as de facto Seafood Manager, Harris received a "Report Of Conference" that outlined what Delchamps contends were deficiencies in his performance. The report emphasized that Harris needed to improve inventory and accounting practices in the department. (Def.'s Mem., Ex. 4.)

In August of 1995, then Market Manager Randy Tyler was terminated, and Greg Gates, a white male, filled the position. Harris did not seek the Market Manager position at this time. (Def.'s Mem., Ex. 1, Harris Dep. at 151.) On or about March 2, 1996, Gates resigned his position. Craig Houston, a black male, was the "Meat Specialist" in charge of Delchamps' meat departments in its Birmingham, Tuscaloosa, Montgomery and Prattville stores. After Gates' resignation, Houston offered the Market Manager position to two Journeymen Meatcutters— Elijah Jordan and Dru Simpson—both black males with significant amounts of meat cutting experience. Houston did not consider Harris for the position because he did not consider him qualified at the time.[4]

4. Delchamps contends that Houston had primary decision-making authority, and offers, in support, the deposition testimony of Houston and Houston's boss, Zone Manager John Zeller. (Def.'s Reply at 2–6.) Essentially, the deposition testimony indicates that Houston had primary, if not

(Def.'s. Mem., Ex. 2, Houston Dep. at 113, 118.) Both Jordan and Simpson turned down the position. Houston then had Carl Williams, the store manager, post a sign in the window seeking applicants for the Market Manager position. Ronald Paige, a white male, responded, was hired, and assumed the position on March 25, 1996. This is the first

sole, decision-making authority, and that Zeller essentially "rubber-stamped" Houston's decisions. (See Id.)

In contrast, Harris contends that Houston did not exercise sole/primary decision-making authority, but was "merely one of Defendants' agents involved in the selection process," (Pl.'s Mem. at 8–10), and offers, in support of his contention, his Affidavit and the Affidavit of Wayne Spivey. These Affidavits allege, basically, that both Zeller, the Zone Manager, and Carl Williams, the Store Manager at the time, exercised substantial influence over employment decisions.

Delchamps challenges Harris' Affidavit—submitted in response to Delchamps' Motion For Summary Judgment—as "self-serving," and argues that it "consists of . . . hearsay allegations, and statements in conflict with Plaintiff's previously given sworn deposition testimony. Defendant submits that Plaintiff's affidavit is not evidence and should be stricken." (Def.'s Reply at 12–13.) Delchamps argues that:

> [I]t is well established that "when a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Clay v. Equifax, Inc., 762 F.2d 952, 955 n. 12 (11th Cir.1985). When deposed, Plaintiff admitted the qualifications of those selected. He admitted he received Reports of Conference and that the deficiencies noted were present. He admitted that shrink was high when he served as acting Manager, and that Houston was very concerned about the shrink numbers. Plaintiff cannot now deny these facts. Finally, Plaintiff's affidavit is replete with self-serving hearsay and unsupported statements of Plaintiff's "belief." It is well settled that Plaintiff's subjective belief is not evidence of discrimination sufficient to preclude summary judgment. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1377 (11th Cir.1996).

(Def.'s Reply at 13–14.) Specifically, Delchamps points to:

> Plaintiff's contradictory testimony regarding Houston's role: in his deposition, Harris stated that he did not know who made several of the employment decisions, yet in his Affidavit, contends that it was not Houston.

(Id. at 6.)

Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." Fed. R.Civ.P. 56(e). To the extent Harris' Affidavit offers statements not based on personal knowledge, or inadmissible hearsay statements, the court will not consider such statements in resolving the pending motion.

Further, the court views with a jaundiced eye affidavits submitted in response to a dispositive motion that contradict, without explanation, previously given testimony. Indeed, precedent dictates that the court disregard the new, contradictory statements. See Clay, 762 F.2d at 955 n. 3 (citing Van T. Junkins and Associates v. U.S. Industries, 736 F.2d 656, 657 (11th Cir.1984)). Harris states in his deposition that he didn't know who had decision making authority over the employment decisions at issue. He contends in his Affidavit, however, that Houston, a black male, did not have primary authority, but that the Zone Manager and Store Manager, both white males, had significant input. These Affidavit statements directly contradict Harris' clear deposition testimony, (see Def.'s Reply, Ex. 1 at 161, 249, 303–05, 396–97), and are offered without adequate explanation for the contradiction. Further, to the extent Harris relies on the statements of co-workers, as opposed to management level employees, these statements would not be considered admissions under Federal Rule of Evidence 801(d)(2), but rather as hearsay, and would be excluded under Rule 56(e). Finally, the court notes that in his deposition, Harris repeatedly refers to his alleged conversations with Houston regarding his employment, or refers to Houston as the one making the decisions over Market Manager positions. Such deposition testimony seemingly is in conflict with his Affidavit. (See also Def.'s Mem., Ex. 2, Houston Dep. at 232–35 (where Plaintiff's attorney questions Houston at length regarding his hiring decisions).)

Accordingly, the court finds that Delchamps' Motion To Strike Harris' statements regarding his knowledge of Houston's role as a decisionmaker is due to be granted. Such statements in Harris' Affidavit will not be considered by the court. The remaining evidence pertaining to Houston's role, therefore, is as follows: (1) Harris testified in his deposition that he does not know who made the employment decisions at issue; (2) Harris testified in his deposition that he repeatedly dealt with Houston regarding his employment; and (3) Houston and Zeller testified in their depositions that Houston has primary decision-making authority. Accordingly, the court concludes that even when viewing the evidence in a light most favorable to Harris, Houston had primary decision-making authority over the employment actions at issue. That is not to say that Houston enjoyed sole discretion over the decisions, rather, the court finds that he had primary responsibility, but received input from various sources. (See, e.g., Def.'s Mem., Ex. 2, Houston Dep. at 108.)

incident where Harris contends Delchamps discriminated against him on the basis of his race by not promoting him.

Despite this contention, Plaintiff has not offered evidence that he was qualified for the position of Market Manager at the time, and Houston testified that in March of 1996, he did not consider Harris for the position because he felt that he was not qualified. Indeed, Harris' experience to that point was as a Journeyman Meatcutter, as Seafood Manager, where Harris exercised meat cutting duties only two hours a day, and as an acting Market Manager for the two and one-half to three weeks between Gates' resignation and Paige's hiring. In fact, Harris admits that Houston told him that the reason Paige was hired was because Paige "had an impressive resume and at that time, we felt you were in seafood too long." (Def.'s Mem., Ex. 1, Harris Dep. at 210.)

Assuming Harris was qualified, however, he has not shown that Paige, the white male who was hired, was equally, or less qualified for the position. In fact, the evidence before the court shows that Paige was more qualified than Harris for the position. First, Harris admitted in his deposition that he was not aware of the extent of Paige's prior experience with meat cutting. (Def.'s Mem., Ex. 1, Harris Dep. at 158, 191.) Paige's employment application indicated that he had over twelve years of management and meatcutting experience. (*Id.*, Ex. 6.) Further, as noted earlier, Harris admits that Houston told him that Paige was hired, in part, because of his "impressive resume." (Def.'s Mem., Ex. 1, Harris Dep. at 210.) Harris merely contends that he was better qualified because of his years of employment and his knowledge of the store.

Delchamps correctly notes that "federal courts do not sit to second-guess the business

judgment of employers." (Def.'s Mem. at 17 (*quoting Combs*, 106 F.3d at 1543).) Absent evidence that Harris was equally or more qualified than Paige, the court will not second-guess Delchamps' decision to hire Paige over Harris. Accordingly, the court finds that Harris has failed to meet the second (qualified) and/or fourth (non-protected class individual with equal or less qualifications was hired) prongs of his prima facie case.[5]

■ Paige resigned his position on April 3, 1996, less than two weeks after he assumed the Market Manager position. The position remained open for a little over a month until the hiring of Alton Bozeman on May 6, 1996. During this time period, Houston asked Harris to fill-in as Market Manager. Houston testified in his deposition that during Harris' tenure as acting Market Manager he:

> found out-of date meats, trucks were not checked-in properly, invoices were not checked-off as to what was received, forms were not completed on merchandise not received, shrinks were very high, and [he] counseled Plaintiff repeatedly regarding over cutting.[6]

(Def.'s Mem. at 6 (citing Def.'s Mem., Ex. 2, Houston Dep. at 129–31, 138–39 and Ex. 9).)

In contrast, Harris contends that Houston "praised him consistently for his excellent work in the capacity of acting market manager and did not, as he now insists in deposition, isolate any significant performance deficiencies." (Pl.'s Mem. at 13.) Harris fails to offer any specific support for this contention, however, only citing to his "affidavit and deposition testimony." (*Id.*)

Harris' Affidavit, however, merely states that in regards to Houston's description of Harris' poor performance as acting Market Manager:

**5.** Additionally, and in the alternative, assuming *arguendo* that Harris has established a prima facie case relating to the March 1996 resignation of Gates and hiring of Paige, the court finds that Delchamps has offered a legitimate, non-discriminatory reason for its decision to hire Paige over promoting Harris, and that Harris has failed to offer other, additional evidence, in addition to the evidence offered in support of his prima facie case, that would allow a reasonable jury to con-

clude that Delchamps' hiring of Paige over promoting Harris was a pretext for discrimination.

**6.** Houston defines "shrink" as "the difference between what you actually pay for a product and what you sell it for." (Def.'s Mem., Ex. 2, Houston Dep. at 173–177.) High shrink rates are caused by the improper inventorying of products and the utilization of improper procedures in the trimming and cutting of meat. (*Id.*)

I absolutely dispute this contention and the material parts of Mr. Houston's testimony. Every meatcutter who has worked with me since I joined Delchamps and every single market manager under who I have worked have told me, and will testify in this case, not only that I performed well but also that Mr. Houston's criticism is not justified.

(Pl.'s Mem., Ex. 1, Harris Aff. at 3.) Harris further contends that:

each of the five Whites selected commented to me at the time, and I expect them to testify now, that I had been doing a good job as acting market manager and that I was well qualified to be the market manager. In fact, four of them—Ronald Paige, Alton Bozeman, Kelly Siler, and Wayne Spivey—told me that they could not understand why Delchamps did not promote me instead of bringing them in to be the market manager at the Atlanta Highway supermarket.

(*Id.* at 4.)

All of the alleged statements of former Delchamps' employees are inadmissible hearsay, and consequently, cannot be considered under rule 56(e). *See* Fed.R.Civ.P. 56(e); *see also, supra* note 4. The court can consider, of course, the statements of the individuals themselves, as long as they meet the requirements of Rule 56(e), or Harris' recitation of the alleged statements, assuming they could be defined as admissions under Federal Rule of Evidence 801(d)(2) by individuals acting as agents of Delchamps at the time the alleged statements, were made. As an initial matter, the court notes that Harris merely makes general, conclusory allegations as to what these individuals said to him. A specific examination of the affidavits and depositions of these individuals, offered by Harris, show that they are not amenable to the generous description given them by Harris.

First, Harris assigns several statements to Alton Bozeman—the individual who filled the Market Manager position immediately after Harris' tenure as acting Market Manager in April of 1996. Harris has failed to offer either a deposition or affidavit from Bozeman that substantiates Harris' claim. Consequently, the court cannot consider Harris'

bare assertion as to what Bozeman said to him or how Bozeman would testify. Fed. R.Civ.P. 56(e).

Kelly Siler replaced Bozeman as Market Manager and served in the position from July 8, 1996 to September 20, 1996. He states in his Affidavit that Harris was doing a good job as acting Market Manager *when he (Siler) came in* as Market Manager. (Pl.'s Mem., Ex. 4, ¶ 4.) Siler says nothing about Harris' performance as acting Market Manager in April of 1996 prior to the hiring of Alton Bozeman. And, contrary to Harris' assertion that *all* Market Managers said to him that they could not understand why Delchamps' brought them [the new manager] in rather than promoting Harris, Siler is the only Market Manager to substantiate Harris' claim. (*Id.*) He further states that he believes that Harris was fully qualified to be Market Manager and that he was not aware of any negative reports regarding Harris' performance. (*Id.*) Further, Siler states that he was:

aware of … a problem with inventory shrinkage and gross profits in the market department in 1996, but that is definitely not a problem that can be blamed on (Harris) when he was acting market manager or meatcutter. It was common knowledge that the store had a security problem during that time, with cashiers and other employees just taking meats out the door. I remember specifically that five or six employees were fired in connection with this problem.

(*Id.*) Siler's Affidavit, however, does not refute Houston's assessment of Harris' performance as acting Market Manager during April of 1996 in terms of Houston's noted deficiencies with out-of-date meats, trucks not being checked in properly, invoices not properly checked-off as to what was received, forms not completed on merchandise not received or over cutting. (*See* Def.'s Mem. at 6 (citing Def.'s Mem., Ex. 2, Houston Dep. at 129–31, 138–39 and Ex. 9).)

Wayne Spivey replaced Kelly Siler and served as Market Manager from September 23, 1996 to December 5, 1996. He states in his Affidavit that Harris performed well when he worked under Spivey, even fulfilling

some of the Market Manager's responsibilities. (Pl.'s Mem., Ex 4, Spivey Aff.) Spivey further states that he thought Harris was qualified for the position of Market Manager. (*Id.*) Nowhere in his Affidavit, however, does Spivey comment on Harris' performance as acting Market Manger generally or in April of 1996, and states nothing to refute Houston's assessment of Harris' performance as acting Market Manager during April of 1996. (*Id.*)

Finally, Scott Schmacker replaced Wayne Spivey, and assumed the position of Market Manager on December 22, 1996. His deposition merely establishes that Harris helped to train Schmacker in some of Delchamps' practices and procedures and that he was generally happy with Harris' performance. (Pl.'s Mem., Ex. 5.) Nowhere does Schmacker address Harris' performance as acting Market Manager. (*Id.*)

Even if the court did consider Harris' general, unsupported allegations, Harris has not offered evidence specifically rebutting Houston's evaluation of his performance during April 1996 when Harris was acting Market Manager, other than Spivey's Affidavit statement regarding shrinkage. And, Spivey worked at Harris' store from September to December of 1996, not in April or May of 1996. Neither the Affidavits of Spivey and Siler, nor Schmacker's deposition address Harris' April 1996 performance as acting Market Manager.

Harris' only credible contentions regarding Houston's assessment of his performance as acting Market Manager during April of 1996 is that he "absolutely dispute[s]" Houston's testimony, (*Id.* at 3), and, arguably, Spivey's testimony regarding shrinkage. It is not even clear that Harris aims this "absolute dispute" at Houston's description of Harris' performance in April of 1996. However, in an abundance of caution, and in considering the evidence in a light most favorable to Harris, the non-moving party, the court finds there to be an issue of fact regarding Houston's descriptions of Harris' deficiencies during April of 1996. The court makes this finding based on Harris' "absolute dispute" of Houston's testimony, the fact that Houston states in his deposition that he did not hold

Harris personally responsible for the problems because Harris was only the acting manager, (Def.'s Mem., Ex. 2, Houston Dep. at 131), and from the lack of *written* evidence substantiating Houston's oral testimony of Harris' deficiencies. Although Delchamps did present written evidence of high shrinkage, (*Id.*, Ex. 9), Spivey's Affidavit, when viewed in a light most favorable to Harris, neutralizes that evidence. Accordingly, the veracity of Harris' contentions versus Houston's is an issue to be resolved by the trier of fact, and is not within the province of the court.

■ As will be explained, however, this finding does not save Plaintiff's prima facie case requirement as it relates to the May 6, 1996 hiring of Alton Bozeman. Houston testified that he considered Harris for Market Manager but ultimately rejected him: (1) mainly because of the high shrink rate, but also because of the other deficiencies in Harris' performance as acting Market Manager (*Id.*, Ex. 2, Houston Dep. at 129–143); (2) because Houston felt that Harris could not do anything about the shrink rate (*Id.*); (3) because Houston felt that Harris was not following the various recommendations on how to improve the Department that Houston had communicated to Harris (*Id.*); and (4) because Houston felt that Dru Simpson was doing all of the meat cutting at the Atlanta Highway store. (*Id.*) Instead, on April 28, 1996, Houston hired Alton Bozeman who assumed the position on May 6, 1996.

Other than the fact that Bozeman was a white male, Harris has no other reason to believe that in hiring Bozeman, Delchamps discriminated against Harris on the basis of his race. (Def.'s Mem., Ex. 1, Harris Dep. at 228.) Harris was generally unaware of Bozeman's employment background, (*Id.* at 222–224), and states that the only reason he felt more qualified than Bozeman was that he thought that Bozeman did not want to work the hours required of a Marker Manager. (*Id.*) Harris does not dispute Bozeman's qualifications, (*Id.* at 223), which show that he had over fifteen years of experience as a meat market manager, and that he was—at that time—working as a Journeyman Meatcutter at one of Delchamps' other

Montgomery area stores. (Def.'s Mem., Ex. 7.) Bozeman had significantly more management experience than Harris, and Harris admits that Bozeman was a "strong meat cutter," (*Id.*, Ex. 1, Harris Dep. at 223). Bozeman was also familiar with Delchamps' operations because of his previous position as a Journeyman Meatcutter at another Delchamps store. Accordingly, the court finds that, as to the May 1996 hiring of Alton Bozeman, Plaintiff has failed to meet the fourth prong of his prima facie case; Harris has not shown that Bozeman was either as qualified or less qualified than Harris for the Market Manager position.[7]

On June 8, 1996, Plaintiff received a Report of Conference regarding his job performance. (Def.'s Mem., Ex. 5.) It states:

Subjects Covered:

Donald's job performance was below standard; no meat markdown, meat left in cooler to be put out, case not straightened, service meat not freshly cut (from day before) etc ...

Actions To Be Taken:

Donald knows what his job task are [sic] and any further low job performance can result in suspension and/or termination

(*Id.*) It was signed by Carl Williams, Harris' Store Manager at the time. (*Id.*) Harris does not contend that there was anything discriminatory about the report or the veracity of the cited deficiencies. (Def.'s Mem., Ex. 1, Harris Dep. at 261–62.) Harris merely contends that those deficiencies were not his fault. (*Id.*)

Bozeman was out of work on medical leave from May 29, 1996 to July 6, 1996. He resigned as Market Manager on July 28, 1996. Houston contends that he again offered Dru Simpson and Elijah Jordan the job, but both turned him down. (*Id.*, Ex. 2, Houston Dep. at 165–67.) Harris is unaware of whether Simpson and Jordan were offered the job, (Def.'s Mem., Ex. 1, Harris Dep. at

247–48.) Simpson states that following Bozeman's resignation, Houston never asked him to take the Market Manager position. (Pl.'s Mem., Ex. 6, Simpson Aff. at 5, ¶ 7.) Neither Party has produced any depositions or affidavits from Elijah Jordan.

Regardless of whether Houston offered Jordan and Simpson the position, however, Houston testified that he also considered Harris for the job. (Def.'s Mem., Ex. 2, Houston Dep. at 170.) Houston felt, however, that although Harris had shown some improvement, he still needed more experience. (*Id.*) Houston noticed, for example, that other Delchamps' employees were not following Harris' leadership, that there had been complaints by customers that on Friday and Saturday nights, no one was on duty in the meat department to wait on people, and that shrink numbers were still high. (*Id.* at 172.) Houston testified that ideally, shrink numbers should be around five. (*Id.* at 172–73.) When Harris was acting Market Manager, shrink numbers were around twenty. (*Id.* at 173.) In contrast, when Alton Bozeman was Market Manager, shrink numbers were around eleven or twelve. (*Id.*) Houston made the assessment that Harris had improved, but still needed more development, after speaking with then Store Manager Jason Adams. (*Id.* at 170.) On August 4, 1996, Houston promoted Kelly Siler to the Market Manager position.

Before his promotion Siler had served as a Journeyman Meatcutter at one of Delchamps' Birmingham, Alabama stores. He had previously spent seventeen years as a meat cutter, market manager and trainer at various supermarkets. (Def.'s Mem., Ex. 8.) He also had six years experience as a trainer and market manager for Wal–Mart. (*Id.*) Although Harris admits that he did not know anything about Siler's background or previous experience, Harris contends that he was more qualified than Siler to serve as Market Manager. (Def.'s Mem., Ex. 1, Harris Dep.

---

**7.** Additionally, and in the alternative, assuming *arguendo* that Harris has established a prima facie case relating to the April 3, 1996 resignation of Paige and May 6, 1996 hiring of Bozeman, the court finds that Delchamps has offered a legitimate, non-discriminatory reason for its decision to hire Bozeman over promoting Harris, and that Harris has failed to offer other, additional evidence, in addition to the evidence offered in support of his prima facie case, that would allow a reasonable jury to conclude that Delchamps' hiring of Bozeman over promoting Harris was a pretext for discrimination.

at 243–44.) He contends that he was better qualified than Siler because he was more familiar with the operations of the Atlanta Highway store, and because he felt that he was being overlooked for what he had done as acting Market Manager. (*Id.* at 244–46.) The following colloquy is telling:

Q: I imagine you felt that Mr. Siler's appointment to the market manager position was discriminatory against you based on your race?

A: Yes, ma'am.

Q: And why do you feel that way?

A: He, too, was a white male. And also he was brought outside of the company in.

Q: Well, the fact that he was brought inside from outside of the company, why do you feel that was discriminatory against you based on your race?

A: Because he, too, was a white male.

Q: So it was only the fact that he was a white male that you felt was discriminatory?

A: Yes, ma'am.

Q: If he had been a black male brought inside from out of the company, would you have felt that was discriminatory against you based on your race?

A: I would say yes, ma'am.

Q: And why is that?

A: Because I'm still at that position. I'm being overlooked for what I've done as acting meat market manager.

Q: Well, isn't it true, Mr. Harris, that you feel that it just wasn't fair to you that you were overlooked?

A: Yes, ma'am.

(Def.'s Mem., Ex. 1, Harris Dep. at 245–46.)

Based on the foregoing, the court finds that Plaintiff has failed to establish the fourth prong of his prima facie case. Siler had several more years of experience than Harris, and Houston noted that there were still some problems with Harris' performance. Harris has not shown that Siler was as qualified or less qualified for the position of Market Manager.[8]

On September 20, 1996, because of personal problems, Siler attempted to resign as Market Manager. (Def.'s Mem., Ex. 2, Houston Dep. at 213–14; Ex. 3, Zeller Dep. at 99, 102.) Instead of accepting Siler's resignation, however, Delchamps moved Siler to its Pratville, Alabama store, and moved Wayne Spivey, Market Manager at the Pratville store to the Atlanta Highway store. (*See Id.; Id.*) Business at the Pratville store had slowed due to competition, and Houston felt that placing Siler in the slower Pratville store and moving Spivey, one of Delchamps' more experienced managers, to the Atlanta Highway store would aid Spivey and improve performance at the Atlanta Highway store at the same time. (*Id.*, Ex. 2, Houston Dep. at 213–14.)

Harris admits that Spivey was an experienced Market Manager. (Def.'s Mem., Ex. 1, Harris Dep. at 299.) He contends, however, that even though Spivey had been a Market Manager in the Delchamps system since 1995, and had other previous experience in the Delchamps system, and he (Harris) had less than two months experience as an acting Market Manager, that his experience was equal to Spivey's. (*Id.*) Later in his deposition though, Harris admits that Spivey had more experience than he. (*Id.* at 300.) Despite this admission, however, Harris still felt that Spivey's transfer was discriminatory because Spivey was a white male. (*Id.* at 300–01.)

Other than this unsupported contention, however, Harris offers no evidence to show that Spivey was as qualified or less qualified than he. Accordingly, the court finds that as it relates to the transfer of Spivey to Delchamps' Atlanta Highway store, Harris has

---

8. Additionally, and in the alternative, assuming *arguendo* that Harris has established a prima facie case relating to the resignation of Alton Bozeman and hiring of Kelly Siler, the court finds that Delchamps has offered a legitimate, non-discriminatory reason for its decision to hire Siler over promoting Harris, and that Harris has failed to offer other, additional evidence, in addition to the evidence offered in support of his prima facie case, that would allow a reasonable jury to conclude that Delchamps' hiring of Siler over promoting Harris was a pretext for discrimination.

failed to meet the fourth prong of his prima facie case requirement; he has not shown that Spivey was as qualified or less qualified for the Market Manger position.[9]

Spivey resigned his employment with Delchamps on approximately December 5, 1996. Although Houston again considered Harris for the Market Manager position, he eventually made the decision to hire Scott Schmacker, who assumed the position on December 22, 1996. (Def.'s Mem., Ex. 2, Houston Dep. at 231–33.) During the approximate two weeks between Spivey's resignation and Schmacker's arrival, Harris again was acting Market Manager. During this timed period, however, shrink went up. (*Id.*, Ex. 1, Harris Dep. at 332–33.) Harris knew that Houston's primary concern was the reduction of shrink numbers, and admitted that Houston had spoken with Harris regarding the high shrink numbers several times. (*Id.* at 333–35, 347, 351–352.)

After considering Harris and his previous performances as acting Market Manager, Houston decided that it would be more prudent to hire Schmacker. The following excerpt from Houston's deposition explains his reasoning:

Q: How did you let Donald [Harris] know that you had decided to hire Scott Schmacker to run the market?

A: I think I talked with Scott—Donald—I said, Donald—I'm pretty sure I talked to Donald Harris. And I said, Donald, I believe that I'm going to hire Scott Schmacker to run the market. And I do not want you to feel like we overlooked you and that we are not considering you for market manager. I feel like you're doing a lot better job, and that I will keep you in mind, no matter what happens in the future. I will always have you there.

. . .

Q: Okay. What impressed you about Scott Schmacker sufficiently to hire him as your new market manager instead of giving Donald that opportunity?

[Atty]: Objection to form.

A: I felt that Scott could give me what I was looking for a long time when talking to him through a lengthy conversation in the break room about his abilities to increase the gross profit and reduce the shrink in the department and to merchandise—to merchandise properly, and give me the things that I thought that we had been lacking in my department.

Q: So actually, you were impressed, really, just by your interview with him.

A: Right.

Q: You didn't have to see him perform any work?

A: No, I did not.

Q: Okay. And you—having been through at that point five different market managers at your Atlanta Highway store, you felt more comfortable going on the outside to hire someone based solely on the interview?

A: Yes.

Q: Okay. And you felt that Scott Schmacker as of December 21 had qualifications that commended him more so than Donald Harris?

A: I felt that in the best interest of Delchamps, that we should look outside of Delchamps because I had hired people in Delchamps already, and I had fallen—we had fallen short even with them.

Q: But you never hired Donald Harris, who had been at Delchamps at that store for the entire year.

[Atty]: Objection to form.

A: No.

Q: Okay. And again, were you mindful of the Delchamps policy of trying to ad-

---

**9.** Additionally, and in the alternative, assuming *arguendo* that Harris has established a prima facie case relating to the transfer of Wayne Spivey, the court finds that Delchamps has offered a legitimate, non-discriminatory reason for its decision to transfer Spivey over promoting Harris, and that Harris has failed to offer other, additional evidence, in addition to the evidence offered in support of his prima facie case, that would allow a reasonable jury to conclude that Delchamps' transfer of Spivey over promoting Harris was a pretext for discrimination.

vance those from within for promotion?

A: No. I mean—

Q: All right. Now—

[Atty]: Did you finish your answer?

Q: I'm sorry. Did I interrupt you? Did you want to say something else?

A: I just felt that at that time I had given almost everyone an opportunity, even Dru Simpson and Donald Harris, who were at that store. And I felt like that the job was not being complete—completely brought up to par where I wanted it at that time. And I really needed the numbers to change, because it is my responsibility to decrease the shrink and increase the gross profit. And I felt that stepping outside of the company, I may have a better opportunity to do these things.

(Def.'s Mem., Ex. 2, Houston Dep. at 232–35.)

Harris has no knowledge of Schmacker's experience or qualifications. (*Id.*, Ex. 1, Harris Dep. at 389–90.) However, other than the fact that deposition testimony discloses that Schmacker had acted as an assistant market manager at another supermarket, (*see id.*), neither Party has presented evidence of Schmacker's qualifications. The court finds, however, that Harris has failed to meet his burden of showing that Schmacker was either as qualified or less qualified for the Market Manager position.

The court bases its finding on the fact that Harris has presented no evidence of Schmacker's qualifications, or lack thereof, and Schmacker had been an assistant market manager at another supermarket, whereas Harris had only filled in as acting Market Manager for a total time frame of less than three months. Additionally, Houston's deposition testimony establishes that he believed that there were still problems with Harris' performance, and that he believed that Schmacker would do a better job.

Although the court has found that Harris has failed to meet his evidentiary burden of showing that Schmacker was either as qualified or less qualified for the position, the evidence is not as clear in this instance as it was with the previous four instances. Assuming then, that Harris has established a prima facie case, it is evident that Delchamps has established a legitimate, non-discriminatory reason for its employment decision. Houston made the business decision to hire Schmacker over promoting Harris, and recited objectively valid grounds for doing so in his deposition. Consequently, Harris now bears the burden of showing that Houston's stated reasons for not promoting Harris were a pretext for discrimination. This he has failed to do: Harris has not presented evidence calling those grounds into question.

Harris testified in his deposition that even if Schmacker had been a black male, Harris would have felt that his placement in the Market Manager position was discriminatory. (*Id.* at 391.) Harris testified as follows:

Q: If Mr. Schmacker had been a black male, for example, do you feel that it would have been racially discriminatory against you?

A: Yes, ma'am.

Q: And why is that?

A: Like I said, I had that time with the company. If you come—if you came from outside the company and you were hired over me and I spent that time in that particular market and that store, I felt I should have been that candidate if I wanted that position.

(*Id.*) As his deposition testimony shows, Harris merely felt that it was unfair that he was not promoted. (Def.'s Mem., Ex. 1, Harris Dep. at 391.) He has not brought forth any other evidence, in addition to the evidence proffered in support of his prima facie case that could lead a reasonable fact-finder to conclude that Houston's decision was based on Harris' race.

### C. Miscellaneous Allegations

■ Harris offers two additional arguments in support of his case. First, he contends that Delchamps did not have a formal structure of soliciting applications and otherwise evaluating applicants for hire or promotion in an objective, competitive manner. (*See* Pl.'s Mem. at 6.) In this action, the court

has already found that Harris has failed to establish that those given the position of Market Manager were as qualified or less qualified than he for the position. If a plaintiff fails to establish that the individual given the position was not as qualified as the plaintiff or was less qualified, the plaintiff has not met his or her burden of establishing their prima facie case, and the court need not reach the question of whether the employer's use of subjective criteria could be found to be a pretext for discrimination by a reasonable fact-finder.[10]

The court reads Harris' pleadings to assert, however, that because Delchamps' criteria were not formalized, a question of fact exists as to whether Harris was, at the least, as qualified as those given the Market Manager position. And, extending that logic, that a question of fact remains as to the veracity of Delchamps' proffered legitimate, non-discriminatory reasons given the use of subjective criteria. Even if the court accepted this argument and found that Delchamps' utilization of subjective criteria raises a question of fact as to whether Harris was at the least as qualified as those hired or promoted, and, consequently finds that Harris has established his prima facie case, the court still finds that even by pointing to Delchamps' use of subjective criteria, Harris has still failed to adequately rebut Delchamps' proffered legitimate, non-discriminatory reasons for its actions.

■ Decisions based *entirely* on subjective criteria are closely scrutinized because "subjective determinations may offer a convenient pretext for giving force and effect to [discrimination]." *Thornton v. Coffey,* 618 F.2d 686, 691 (10th Cir.1980). Even the use of *exclusively* subjective hiring and promotion criteria, however, does not automatically establish that the employer's proffered legitimate non-discriminatory reasons were pretextual. *Id.* Further, the employment decisions in the case at bar were *not* based on *exclusively* subjective criteria. The evidence shows that the employment decisions were made on objective criteria such as years of experience, shrink rate, inventory control, meat cutting, and customer complaints *as well as* subjective criteria such as perceived leadership ability. The "scrutiny," then, will not necessarily be as "close."

■ Here, Harris has failed to rebut the fact that objectively, those placed in the Market Manager position were more qualified for the position than he. In other words, based on the objective evidence, Harris has failed to show that those hired or promoted were objectively as qualified or less qualified than he. *Combs,* 106 F.3d at 1539 n. 11. Nevertheless, for the sake of argument, the court will assume that because of Delchamps' use of subjective criteria, Harris has managed to establish a prima facie case even in light of the objective evidence. The question remains, therefore, whether Harris' allegations regarding Delchamps' use of subjective criteria could allow a reasonable fact-finder to conclude that Delchamps' proffered reasons were pretextual. The court answers that question in the negative.

Harris has failed to identify what *specific* subjective criteria he alleges were utilized discriminatory or *exactly* how the lack of formalized standards worked to discriminate against him on the basis of race. Further, it is undisputed that Harris was aware of the criteria Houston was utilizing in making his hiring/promotion determinations. Harris knew of Houston's emphasis on shrink rates, and knew that Houston was evaluating Harris' and others' performance of the duties and responsibilities of a Journeyman Meatcutter or manager. Harris has offered no evidence whatsoever that these criteria were implied inconsistently generally, or that they were implied inconsistently in his case. Arguably, Houston made subjective assessments of Harris' abilities in relation to other candidates. Plaintiff does not show, however, nor does the record disclose, any shred of evidence that Houston's subjective analysis was or could have been based on impermissible factors such as Harris' race.

---

**10.** As will be discussed *infra,* the use of subjective criteria could, of course, aid in establishing a plaintiff's prima facie case.

▮ Further, even assuming Harris was, at the least, as qualified as those placed in the position of Market Manager, ordinarily, court's defer to an employer's business judgment exercised in choosing between two qualified (but not identical) candidates. *Combs,* 106 F.3d at 1543. As noted, absent an illegitimate basis, the court will not second-guess business decisions, no matter how questionable their rationality, *id.,* and "subjective criteria necessarily and legitimately [may] enter into personnel decisions involving supervisory positions." *Risher v. Aldridge,* 889 F.2d 592, 597 (5th Cir.1989). Title VII does not require that the employer's decision be rational or that an employer hire or promote the most qualified applicant, nor does it even guarantee success for those having greater merit. Title VII only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin. *See Gilchrist v. Bolger,* 733 F.2d 1551, 1553 (11th Cir.1984); *Garcia v. Gloor,* 618 F.2d 264, 269 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). Although failure to hire the most qualified or even an as-qualified applicant may raise an inference of discrimination, standing alone it does not automatically create an issue of fact for trial. *See McCarthney v. Griffin–Spalding County Board of Education,* 791 F.2d 1549, 1552 (11th Cir.1986).

▮ Finally, Houston, the primary decision maker, was the same race as Harris. On its own, this fact does not preclude potential Title VII liability. *See United States v. Crosby,* 59 F.3d 1133, 1135 n. 4 (11th Cir. 1995); *Billingsley v. Jefferson County,* 953 F.2d 1351, 1353 (11th Cir.1992). However, the fact that the primary decision maker was the same race as the employee *and* the fact that this decision maker offered the Market Manager position to other employees who were the same race as the Plaintiff militates, absent any evidence to the contrary, against an inference of discriminatory animus.[11]

Based on the foregoing, and even when viewing the evidence in a light most favorable to Harris, the court finds that he has failed to establish that Delchamps' use of subjective hiring and promotion criteria—in this case—could be found by a reasonable fact-finder to be a pretext for discrimination.

▮ The second ground Harris raises is that Delchamps' had a "practice and pattern of discriminating against Black employees by denying them promotional opportunities for, and promotions into, management." (Pl.'s Mem. at 12.) In support of this argument, he offers the statements of several former Delchamps' employees. (*See* Pl.'s Mem., Exs. 7–9.) These statements could arguably lead a fact-finder to conclude that Store Manager Carl Williams is a racist. However, Harris has offered no evidence that this racial animus or any alleged racially derogatory statements influenced the employment decisions regarding Harris. Such unconnected allegations cannot form the bases of a valid Title VII claim. *See Trotter,* 91 F.3d at 1453–54; *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("stray remarks in the work place ... unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden"); *Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir.1987) (individual making alleged discriminatory statements played no part in decision making process); *but c.f. Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1500–01 (11th Cir.1991) (evidence that a supervisor told the plaintiff shortly before his termination that he was "too old" and "making too much money," combined with a history of favorable job performance and dissimilar treatment of younger employees, warranted submitting the case to a jury).

▮ As for Harris' allegation of Delchamps' generally discriminatory practice or policy, such contentions, as presented by Harris, do not establish a viable Title VII claim. Statistics alone may be used to estab-

---

11. Elijah Jordan and Dru Simpson were the two black employees to whom Houston offered the Market Manager position. Delchamps contends that both were offered the position more than once. Simpson contends in his Affidavit that he was only offered the position once. Neither party has presented any depositions or affidavits from Jordan. Even when viewed in a light most favorable to Harris, it is clear that Houston did offer the position to Jordan and Simpson at least once.

lish a prima facie case where a gross, statistically significant disparity exists. *See Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"). More than mere statistical evidence is necessary, however, to satisfy the plaintiff's ultimate burden of proving intentional discrimination in his or her case. *See, e.g. Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 160 (2d Cir.1991) (noting that statistical evidence, standing alone, was inadequate to establish a pattern or practice of discrimination), *cert. denied,* 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). In *Deloach v. Delchamps, Inc.,* 897 F.2d 815, 820 (5th Cir.1990), for example, the Fifth Circuit noted that statistical evidence alone cannot prove pretext. *See also Barnes v.. GenCorp Inc.,* 896 F.2d 1457, 1468 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). Accordingly, in addition to statistical evidence, plaintiffs should proffer nonstatistical evidence such as anecdotal evidence of individual instances of discriminatory treatment. *See, e.g., Maddox v. Claytor,* 764 F.2d 1539, 1556–57 (11th Cir. 1985) (no classwide disparate treatment found where "the anecdotal evidence was sparse").

In the case at bar, however, other than bare assertions of a pattern and practice of discrimination, Harris has not offered any evidence, statistical or otherwise, of such conduct. Conclusory allegations of discrimination, without more, will not suffice to establish pretext. *Mayfield,* 101 F.3d at 1376. And, Houston's deposition establishes that there are several minorities in management positions throughout the Delchamps system. (*See* Pl.'s Mem., Ex. 12, Houston Dep. at 33–41.) While this fact does not necessarily mean that Delchamps does not discriminate in its hiring or promotion practices or that Delchamps did not discriminate in Harris' case, it does rebut Plaintiff's bare allegations of a pattern or practice of discrimination.

## III. CONCLUSION AND ORDER

On the record before it, the court sympathizes with Harris' perception of his treatment by Delchamps. The record discloses, however, that his treatment, while possibly unfair, was not discriminatory. *See Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1523 (11th Cir.1990) ("basic unfairness does not establish discrimination"). Indeed, Harris seems to admit as much in his deposition where he states that he still would have felt that he was discriminated against on the basis of his race even if all of the individuals placed in the Market Manager position were black. (Def.'s Mem., Ex. 1, Harris Dep. at 390–93.)

Harris has failed to establish a prima facie case of discrimination and, alternatively, has failed to adequately rebut Delchamps' proffered legitimate, non-discriminatory reasons for its decisions. Accordingly, based on the foregoing, it is CONSIDERED and ORDERED that:

(1) Defendant's Motion To Strike be and the same is hereby GRANTED in part. To the extent Plaintiff's Affidavit contradicts his deposition testimony, as enunciated *supra,* note 4, it is ORDERED that such statements be and the same are hereby STRICKEN;

(2) Defendant's Motion For Summary Judgment be and the same is hereby GRANTED; and

(3) Because resolution of Delchamps' Motion For Summary Judgment disposes of the allegations raised in Plaintiff's pleadings, this action be and the same is hereby DISMISSED, each Party to bear his or its own costs.